ORIGINAL

Buddy P. Kamakeeaina, Plaintiff Pro Se
2888 Ala Ilima Street, Apt. 1908
Honolulu, Hawaii 96818
Phone: (808) 291-7113
Email: bkamakee@outlook.com

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
APR 12 2021
at __ o'clock and __ min __M
MICHELLE RYNNE, CLERK

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

Civil No. **C V21  00179  JAO KJM**

| | |
|---|---|
| Buddy P. Kamakeeaina, | ) |
| | ) 1. ADA , §12112(b)(5)(A), |
| Plaintiff Pro Se, | )    "Failure to Accommodate", |
| | )    (36 Counts); |
| vs. | ) 2. ADA , §12112(d)(4)(A), |
| | )    "Unacceptable Medical Examinations |
| AOUO Interstate Building c/o | )    and Inquiries", (3 Counts); |
| Pure Management, also dba | ) 3. ADA , §12203(b), |
| Pure Real Estate, Inc.; Greg | )    "Prohibition of Threatening, |
| Tatsuguchi, President; Gregory | )    Coercion, & Intimidation", (6 Counts); |
| Murata, Operations Supervisor; | ) 4. ADA , §12112(a), |
| Brandie Viduya, Human Resource | )    "Wrongful Termination", (1 Count); |
| Manager, | ) 5. ADEA , §623(a)(1), |
| | )    "Prohibition of Age Discrimination" |
| Defendants. | )    and "Hostile Work Environment", |
| | )    (2 Counts); |
| | ) 6. Demand for Jury Trial, Relief Sought, |
| | )    & Official Word Count; |
| _____ | ) 7. Declaration. |

## Complaint of Defendants' Deliberate Violations

## of the ADA  & the ADEA

Mailed **On**
Date 4/13/2021

- **Introduction**

Pursuant to 29,CFR,§1601.28: "Notice of right to sue: Procedure and Authority",

the Equal Employment Opportunity Commission (hereinafter referred to as

"EEOC") has issued Plaintiff a "Dismissal and Notice of Right to Sue" signed and

dated on 03-01-2021 which I received via the United States Postal Service on 03-

04-2021. Therefore, and pursuant to 28,USC,§1331: "Federal Question", this

allows me to file an employment discrimination lawsuit against the Defendants in

the United States District Court for the District of Hawaii (hereinafter referred to as

"Federal Court") within ninety-days from receipt of said notice (see Exhibit 002E).

Accordingly, I present to the Federal Court allegations of multiple deliberate

employer violations of the Americans with Disabilities Act of 1990, as amended

(hereinafter referred to as the "ADA"), regarding thirty-six separate violations of

ADA, §12112(b)(5)(A), "Failure to Accommodate"; three separate violations of

ADA, §12112(d)(4)(A), "Unacceptable Medical Examinations and Inquiries"; six

separate violations of ADA, §12203(b), "Prohibition of Threatening, Coercion, and

Intimidation"; one violation of ADA, §12112(a), "Wrongful Termination"; and for

violating the Age Discrimination in Employment Act of 1967, as amended

(hereinafter referred to as "ADEA"), regarding two separate violations of the

ADEA, §623(a)(1), "Prohibition of Age Discrimination" and "Hostile Work

Environment" as described herein.

## I.   Plaintiff's Background

As a pro se Plaintiff, I'm also a 49-year-old male with physical disabilities

involving my approximate 3" inch, left-flank abdominal tumor (see Exhibit 002F)

and my ongoing treatment for a past work-related knee injury (see Exhibit 002G).

I'm also receiving treatment for my psychological disabilities of Post-Traumatic

Stress Disorder (hereinafter referred to as "PTSD") and Depression (see Exhibit

002H). However, my employment background includes an employment-related act

that is relevant to and supportive of my ADA and ADEA allegations as claimed

herein.

### 1.   Hawaii's Legislative Passage of Act 208 (SLH 2010)

On 04-30-2010, I was arrested and charged with two counts of violating Hawaii

Revised Statutes (hereinafter referred to as "HRS"), §707-711: Offenses Against

the Person, Assault 2nd Degree for causing lacerations with a kitchen knife and

physically beating a residential tenant at a condominium complex located in

downtown Honolulu where I had been employed as an unlicensed security guard

which, at that time, was not a lawful requirement under the HRS (see Exhibits

002C & 002D). After being found fit to stand trial, I was convicted of HRS, §707-

711: Assault 2nd Degree and sentenced to a maximum five-year prison term.

However, and in support of my allegations, two out-of-three judicial medical

physicians also diagnosed me, at the time of the Assault 2nd Degree offense, as

suffering from PTSD and Antisocial Personality Disorder. Accordingly, statewide public safety concerns led to the State of Hawaii's 2010 legislative passage of Act 208 (SLH 2010) requiring all security guards throughout the State to be registered and licensed prior to acting as a guard (hereinafter referred to as a "Guard Card"). Accordingly, a Guard Card can only be obtained after satisfying strict safety requirements and upon completion of training courses, clearing federal and state background checks, and payment of fees pursuant to HRS, Chapter 463.1 *et seq*.: "Private Detectives and Guards" (see Exhibit 001B).

## II.   Plaintiff's AOUO Employment & Defendants' Background

In late 2019, I was hired as a Parking Attendant by the Association Of Unit Owners Interstate Building, c/o Pure Management, also known as Pure Real Estate, Inc. (hereinafter referred to as "AOUO") located at 1314 South King Street, Unit 622, Honolulu, Hawaii 96814. The President and principle real estate broker of Pure Management and Pure Real Estate, Inc., Mr. Greg Tatsuguchi (hereinafter referred to as "Tatsuguchi"), also owned multiple other companies, one of which is called BMA, Hawaii (see Exhibit 001D), a building maintenance company with duties that involve light carpentry, plumbing repair, painting, rental apartment and condominium cleanouts and/or turnovers normally labored over by AOUO Operations Supervisor, Mr. Gregory Murata (hereinafter referred to as "Murata"). Unfortunately, AOUO, BMA Hawaii, Tatsuguchi, Murata, and Human Resource

Manager, Ms. Brandie Viduya (hereinafter referred to as "Viduya") failed to meet my expectations of a decent, respectful, and safe working environment. As a result, I was forced to resign as the Parking Attendant due to the Defendants' deliberate violations of the ADA and ADEA as alleged herein.

### III.   Chronological Events of Defendants' Violations of the ADA & ADEA

1. On 10-30-2019, during an interview for the AOUO part-time Parking Attendant position, Murata introduced a separate employment position involving property maintenance of various other properties managed by AOUO, yet maintained by BMA, Hawaii. Apparently, Murata felt compelled to include the BMA, Hawaii employment position within the AOUO part-time Parking Attendant interview due to my various skillsets as portrayed within my submitted résumé. However, and although I did express my interest in the BMA, Hawaii position at the time of the interview, medical limitations and work restrictions would arise during my employment as the part-time Parking Attendant which would confirm my inability to accommodate BMA, Hawaii's need for a property maintenance worker.

2. On 11-06-2019, I started my first day of work as the AOUO part-time Parking Attendant at the Interstate Building.

3. On 11-21-2019, and after being asked by Murata if I possessed a Guard Card, I informed Murata of my inability to obtain the required Guard Card due to my disabilities. Murata said his reason for asking about the Guard Card was because

he thought I would be interested in working more hours since he needed help covering open security guard shifts.

4. On 12-16-2019, I submitted to Tatsuguchi and Murata my physician-authorized Medical Limitations and Work Restrictions letter dated 12-13-2019 (hereinafter referred to as "ML&WR"). This ML&WR limited my duties to the Parking Attendant only and restricted my employer from imposing any additional physical or mental demands upon me during my current state of health (see Exhibit 002A).

5. On 01-02-2020, a homeless male entered the AOUO Interstate Building via the South King Street's main lobby entrance, gained access to the main lobby-area elevators, and sexually assaulted two women in the main building before being apprehended, arrested, and charged with three counts of sexual assault. At the time of these assaults, no AOUO security guard was available to protect AOUO property, tenants, visitors or AOUO staff during regular business hours. Therefore, and as instructed by Tatsuguchi, Murata initiated in late January of 2020 an AOUO main lobby-area security guard post (hereinafter referred to as "AOUO guard post") to be staffed by a licensed guard (see Exhibit 004A).

6. On 02-05-2020, and despite knowing the terms and conditions of my ML&WR, Tatsuguchi asked if I could come to work on my day-off and "help with security". In response, I informed Tatsuguchi that I had previously scheduled medical

therapy for later that day, which Tatsuguchi acknowledged as my being unable to help with security guard duties.

7. On 02-07-2020, and despite knowing the terms and conditions of my ML&WR, Tatsuguchi adjusted my work schedule by changing my Parking Attendant daily start time from 8:00 AM to 7:00 AM. Tatsuguchi said the reason for my schedule change involved helping with security guard duties should the 7:00 AM licensed security guard call in sick.

8. On 03-02-2020, and despite knowing the terms and conditions of my ML&WR, Tatsuguchi stated to the AOUO licensed security guard Mr. Federico Barnaby (hereinafter referred to as "Barnaby") that the Parking Attendant is to roll over and occupy the AOUO guard post while Barnaby patrols exterior areas of the property (hereinafter referred to as "Tatsuguchi's roll over policy").

9. On 03-10-2020, 06-29-2020, 06-30-2020, 07-02-2020, 07-04-2020, and 07-07-2020, I relieved the licensed security guard in compliance with Tatsuguchi's roll over policy while conducting both parking attendant and security guard duties.

10. On 06-22-2020, at about 6:50 PM, AOUO licensed security guard Mr. Lincoln Smith (hereinafter referred to as "Smith") unlocked and left open the AOUO parking garage gate to run across Young Street and address an off-property incident between a group of bystanders aggressively approaching a male on the sidewalk. After said male got blindsided by a punch thrown from a bystander,

Smith tackled, body-slammed, and pinned the male who got punched to the ground. After five minutes of Smith and other bystanders tussling and wrestling with the male, an HPD officer arrived on the scene. However, and as Smith is the only licensed guard monitoring AOUO Interstate Building property between 3:00PM-11:00PM, the entire property was left unsecured as the parking gate had been left open and AOUO's main lobby-area elevators were not monitored including all sixty-plus surveillance cameras located throughout the property. Moreover, and as the COVID-19 pandemic crisis raged on, Smith's on-duty conduct performed off-property while making unsanitary contact with multiple bystanders endangers AOUO staff, owners, tenants, and visitors who may be at risk of being exposed to the COVID-19 virus when coming into contact with Smith, should Smith have unknowingly contracted said virus during said incident.

11. On 07-02-2020, and despite knowing the terms and conditions of my ML&WR and after visiting Tatsuguchi at AOUO unit 622, Murata approached me while I was stationed at the AOUO guard post despite Murata knowing I did not possess a Guard Card, nor did he question Tatsuguchi's roll over policy (see section III, ¶ no.3 & ¶ no.8 herein). Murata then started asking me about my abdominal tumor, which I explained to him that my tumor was shrinking and that I was hopeful that my tumor would shrink enough to remove it with surgery. Afterwards, Murata started suggesting a medical treatment involving a secret remedy that would heal

my abdominal tumor within twenty-four hours. According to Murata, his cousin's

husband is a "big boss" at a pharmaceutical company who knows of the secret

remedy which he planned on sharing with Murata. However, Murata also told me

that if the pharmaceutical company came to know of its secret remedy being

exposed to me, the pharmaceutical company "might want to kill me". Murata also

warned me that "I cannot tell anybody!" about the secret remedy to heal my

abdominal tumor. Nevertheless, at no time did I ask Murata to seek-out treatment

options for my abdominal tumor because, and as clearly stated in my ML&WR,

I'm already under the professional care of a licensed medical physician. Moreover,

Murata's medical treatment suggestions had nothing to do with essential parking

attendant duties nor was it necessary for AOUO business operations. Therefore,

and after allegedly taking photographs of me with his cellphone to possibly pass on

to a hired contract killer whom I would not recognize, I have no doubt that Murata,

while under the guise of trying to help me heal my abdominal tumor, utilized

intimidation and a threat to my life for his and BMA, Hawaii's personal benefit.

Plaintiff's theory is this: Murata tried to convince me that he could heal my

abdominal tumor with a secret remedy which, in turn, would result in the reduction

of the medical limitations and work restrictions of my ML&WR. Therefore, and

because I would be in debt to Murata, I would be constantly coerced, intimidated,

and/or threatened into taking over future BMA, Hawaii labor duties normally

performed by Murata or, if Murata is unavailable, Tatsuguchi, the owner and

president of BMA, Hawaii.

12. On 07-09-2020, and despite knowing the terms and conditions of my ML&WR,

Tatsuguchi made multiple ageist comments directed towards all staff members in

an intimidating, coercive, and bullying manner which resulted in me illegally

conducting both parking attendant and security guard duties at the AOUO's guard

post as described as follows:

(a) "What!? I tell you guys stuff and you guys don't listen?"(directed at staff)
(b) "Huh!?" I told you don't spray, right!"
(c) "What the hell!?"
(d) "You old enough, right!?"
(e) "What's going on!"
(f) "You got to help him downstairs, ...Buddy." (directed at Bldg. Main. staff, Mr. Philip Cheng)
(g) "No security guard today, probably. I need you to stay a little longer too if necessary." (directed at Plaintiff)
(h) "I don't want to have to say this twice again, okay!"
(i) "You guys don't want to do it, go home! Okay!?" (directed at staff)
(j) "Understand!? Really, go home! Okay?" (directed at staff)
(k) "I shouldn't have to be telling you guys twice, or three times, or four times, right!?" (directed at staff)
(l) "You guys all old enough, right!?" (directed at staff)
(m) "RIGHT!?" (directed at staff)
(n) "I tired already! You guys don't want to listen, fine!" (directed at staff)
(o) "You get security for now, okay. Until Frank comes in if Frank comes." (directed at Plaintiff)
(p) "You help him with parking, okay." (directed at Bldg. Main. staff, Mr. Philip Cheng)
(q) "I catch you wiping again, I mean spraying again, okay. You know what's going to happen next?"
(r) "Okay." (End of Meeting)

Apparently, AOUO security guard Barnaby arrived to work at 8:00 AM, one hour later than his 7:00 AM start time. This upset Tatsuguchi, which resulted in Barnaby being suspended for the day. This then led to my illegal occupation of the AOUO guard post as instructed by Tatsuguchi, despite Tatsuguchi knowing I did not possess a Guard Card, nor did he abide by the terms and conditions of my ML&WR. On this date, the duration of time conducting both parking attendant and security guard duties lasted for six hours (i.e., 7:30 AM – 1:30 PM).

13. On 07-11-2020, and after confirming my ability to perform the essential duties of the parking attendant position, Tatsuguchi asked me if my abdominal tumor was shrinking, the same tumor-shrinking topic I discussed with Murata nine days earlier (see section III, ¶ no.11 herein). I explained to Tatsuguchi that my tumor was shrinking and that my plan was to eventually remove it with surgery. However, Tatsuguchi's medical-related inquiry regarding the nature and severity of my abdominal tumor had nothing to do with essential parking attendant duties nor was it necessary for AOUO business operations. I also told Tatsuguchi about how Murata had suggested he could help me heal my abdominal tumor within twenty-four hours via a secret remedy that he had access to via a family member who works for a pharmaceutical company. I also told Tatsuguchi about how Murata had warned me that if the pharmaceutical company found out that people knew of their secret remedy, they might want to kill them. Moreover, and although

Murata's medical treatment suggestions and consequences are profoundly serious concerns, I received no investigative assurances, follow-up questions, or status reports from Tatsuguchi about my reported 07-02-2020 interaction with Murata nor was Murata reprimanded or disciplined in any way prior to my resignation on 09-03-2020.

14. On 07-14-2020, I went to AOUO unit 622 and approached Viduya to request a copy of my ML&WR submitted to Tatsuguchi and Murata on 12-16-2019. Viduya said she would have my requested copy waiting for me at the receptionist desk and to come back later to retrieve it. Afterwards, I returned to unit 622 and was given my requested ML&WR in a sealed envelope by AOUO office secretary/receptionist Ms. Mary-Elizabeth Haith.

15. On 07-14-2020, Tatsuguchi asked me about Barnaby's on-duty performance. I told Tatsuguchi that I see Barnaby at the AOUO guard post and that he appeared to be doing his job. Tatsuguchi then mentioned that both Barnaby and Smith weren't getting along with each other which, if they couldn't work together, Tatsuguchi said he would have to let one of them go. I mentioned to Tatsuguchi that I noticed both guards did not like each other and that it was not a good thing.

16. On 07-25-2020, and while illegally stationed at the AOUO guard post, Viduya approached me to introduce a newly hired administrative staff member named Mr. Felipe Hallenbeck. However, and despite her knowledge of my disabilities,

limitations, and restrictions as listed within my ML&WR, Viduya did not question

Tatsuguchi's roll over policy despite her knowing I did not have a Guard Card.

17. On 07-10-2020, 07-14-2020, 07-16-2020, 07-17-2020, 07-18-2020, 07-20-2020,

07-24-2020, 07-25-2020, 07-27-2020 and 07-30-2020, I relieved the licensed

security guard from the AOUO guard post in compliance with Tatsuguchi's roll

over policy while conducting both parking attendant and security guard duties.

18. On 07-31⁻2020, 08-04-2020, 08-06-2020, 08-15-2020, 08-18-2020, 08-20-2020,

08-21-2020 and 08-24-2020, the AOUO licensed guard who works during the

11:00 PM-7:00 AM shift removed, near the end of their shift, a white piece of

paper covering the viewing lens of surveillance camera no.16 situated inside

AOUO's 2nd building management office located on the P2 parking garage level.

Apparently, the guard would cover the surveillance camera between 12:00 AM-

01:00 AM and then remove the white paper covering the camera lens between 5:30

AM-6:30 AM, just before I would start my Parking Attendant shift at 7:00 AM.

19. On 08-01-2020, 08-03-2020, 08-04-2020, 08-06-2020, 08-07-2020, 08-10-2020,

08-11-2020, 08-13-2020, 08-17-2020, 08-18-2020, 08-20-2020, 08-21-2020, 08-

22-2020, 08-24-2020, 08-25-2020, 08-27-2020, 08-28-2020, 08-29-2020, and 08-

31-2020, I relieved the licensed security guard from AOUO's guard post in

compliance with Tatsuguchi's roll over policy while conducting both parking

attendant and security guard duties.

20. On 09-01-2020, I informed Tatsuguchi about the 11:00 PM-7:00 AM licensed

AOUO guards covering camera no.16 with a piece of white paper during most of

their work shift and then removing said covering just prior to the start of my

Parking Attendant shift at 7:00 AM (see section §III, ¶ no.18 herein). In response,

Tatsuguchi said he'll look into my camera-tampering concerns, but that it will take

a couple of weeks to fully resolve the matter. After hearing Tatsuguchi's response,

I was both alarmed and immediately suspicious. In such a case, licensed guards

tampering with surveillance cameras over an extended period of time justifies an

immediate termination. Furthermore, and based on personal experience, AOUO's

Digital Video Recorders (DVR) stores surveillance cameras' video footage for

approximately fourteen days before overwriting it with recent footage. Therefore, I

allege that Tatsuguchi's plan was to wait a couple of weeks which would allow the

DVR to overwrite any footage relative to my whistleblowing claims, thereby

suppressing any of my camera-tampering concerns. Moreover, and as AOUO

licensed guards covered camera no.16, the AOUO property was unsecured should

the on-duty AOUO guard be either hiding, sleeping, or gathering with others

within the P2 parking-level management office where camera no.16 is located.

This, in turn, presented a very dangerous robbery-type workplace situation for me

because my daily Parking Attendant duties involved removing the previous day's

accumulated cash deposits from both parking pay station kiosks located inside the

unsecured parking garage between 7:00 AM and 8:00 AM. As homeless people and drug addicts have been removed from the parking garage levels and/or fire escape stairwells in the past, AOUO guards covering a camera endangers my health and safety should a lurking criminal attempt to rob me.

21. On 09-03-2020, I submitted to each Defendant a copy of my notice of forced resignation from my position as the AOUO part-time Parking Attendant. This notice cited intimidation, coercion, bullying, breaching my ML&WR, serious risks to my health and safety, whistleblower claims of unsafe workplace conditions, and violations of HRS and state and federal age and disability discrimination laws as reasons for my wrongful termination (see Exhibit 001C).

22. On 10-02-2020, and after informing my physician of the reasons for my forced resignation from the AOUO, my physician modified my ML&WR by emphasizing the word "strict" with italics and by including an additional sentence at the very end of my revised ML&WR (see Exhibit 002B).

IV.   **Defendants' Failure to Accommodate, Unacceptable Medical Examinations and Inquiries, Prohibition of Threatening, Coercion, and Intimidation & Wrongful Termination in Violation of the ADA**

- **Failure to Accommodate**

1. An employer's failure to accommodate the known disability(s) of a qualified individual pursuant to the ADA, §12112(b)(5)(A) is defined as follows:

"§12112(b) Construction. As used in subsection (a) of this section, the term "discriminate against a qualified individual on the basis of disability" includes: (5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."

2. Moreover, my ML&WR states the following:

"…Buddy is also actively treating his mental disabilities of Post-Traumatic Stress Disorder (PTSD) and Depression in tandem with his current abdominal condition. Therefore, Buddy's current work duties as a parking attendant are acceptable for him, but he cannot have any additional physical or mental demands bestowed upon him during his current state of health."

3. Defendants are also complicit for allegedly violating four separate HRS as listed below:

   - HRS, §463-7(a), "Guard and Guard Agencies; License Required.";

   - HRS, §463-8.5, "Guards; Concurrent Employment.";

   - HRS, §463-10.5(a)(3) and HRS, §463-10.5(a)(4), "Guards; Registration, Instruction, Training, Testing, and Continuing Education Required; Renewal of Registration" (see Exhibit 001B).

4. This, in turn, entailed thirty-six separate alleged violations of the ADA, §12112(b)(5)(A), "Failure to Accommodate" when the Defendants deliberately breached my ML&WR on each of the thirty-six separate occasions that I had illegally occupied the AOUO guard post (see sections III, ¶ no.9, ¶ no.12, ¶ no.17, & ¶ no.19 herein). Furthermore, the reasonable accommodations as authorized in

my ML&WR would not have imposed any undue hardship on AOUO business

operations because by deliberately failing to accommodate my disabilities, the

AOUO avoided hiring an additional licensed guard, which would have resulted in

higher AOUO operational costs, and from having to call-in an off-duty AOUO

licensed guard to cover open shifts, which would have resulted in overtime pay.

Therefore, the AOUO illegally profited monetarily by having me perform two

separate employment positions while only paying me the wages for the part-time

Parking Attendant position.

5. Nevertheless, my analysis of Defendants' alleged violations of the ADA,

§12112(b)(5)(A), "Failure to Accommodate" is described as follows:

Tatsuguchi, Murata, and Viduya (i.e., "Defendants") knew, or should have known,

of AOUO's obligation to uphold HRS, §463-7(a) regarding the requirement of a

valid Guard Card, as all active AOUO licensed guards possessed, prior to having

me act as a guard. Defendants also knew, or should have known, of my report to

Murata that I did not possess the required Guard Card because of my disabilities.

Defendants also knew, or should have known, of their obligation to uphold HRS,

§463-8.5 regarding concurrent duties of a parking attendant and the duties of a

licensed security guard. However, Tatsuguchi, despite knowing I did not possess a

Guard Card, initiated a company policy requiring the parking attendant to "roll

over" and occupy AOUO's guard post in the absence of the licensed security

guard. As there is only one parking attendant per scheduled work shift, I illegally

conducted both parking attendant and security guard duties while stationed at the

AOUO guard post. Defendants also knew, or should have known, of their

obligation to uphold HRS, §463-10.5(a)(3) regarding the necessary registration and

training requirements prior to an employee acting as a guard who is not presently

suffering from any psychiatric or psychological disorders prior to being issued a

valid Guard Card. Accordingly, Defendants knew, or should have known, of my

ongoing treatment of my PTSD and Depression as stated within my ML&WR.

Defendants also knew, or should have known, of their obligation to uphold HRS,

§463-10.5(a)(4) regarding the necessary registration and training requirements

prior an employee acting as a guard who has not been convicted of a crime which

reflects unfavorably on the fitness of the individual to act as a guard prior to being

issued a Guard Card. Accordingly, and if a criminal background check had been

completed, Defendants would have known that I am deemed legally unfit to

occupy the AOUO's guard post pursuant to HRS, §463-10.5(a)(4) because of my

2010 Assault 2nd Degree felony conviction. Defendants also knew, or should have

known, that my duties were limited to that of my primary employment position as

the part-time Parking Attendant and that, due to my disabilities, I "cannot have any

additional physical or mental demands bestowed upon (me) during (my) current

state of health" as stated within my submitted ML&WR. Furthermore, and as

clearly stated in section III, ¶ no.5 herein, Defendants knew, or should have known, that the sole purpose behind the implementation of the AOUO's guard post was to conduct official guard duties by licensed guards only.

- **Unacceptable Medical Examinations and Inquiries**

6. An employer's unacceptable medical examinations and inquiries of a qualified individual pursuant to the ADA, §12112(d)(4)(A) is defined as follows:

   "§12112(d) Medical Examinations and Inquiries. (4) Examination and Inquiry. (A) Prohibited Examinations and Inquiries: A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."

7. Moreover, my ML&WR states the following:

   "…Buddy is also actively treating his mental disabilities of Post-Traumatic Stress Disorder (PTSD) and Depression in tandem with his current abdominal condition. Therefore, Buddy's current work duties as a parking attendant are acceptable for him, but he cannot have any additional physical or mental demands bestowed upon him during his current state of health."

8. Therefore, I allege that Tatsuguchi and Murata, both of whom have not been authorized to make medical exams or ask medical questions about my abdominal tumor, deliberately violated three counts of the ADA, §12112(d)(4)(A) when Tatsuguchi and Murata questioned the nature and/or severity of my disability and when Murata suggested an alternate "secret remedy" medical treatment (see section III, ¶ no.11 & ¶ no.13 herein) which was not job-related and not necessary for AOUO business operations.

- **Prohibition of Threatening, Coercion, and Intimidation**

9. An employer's prohibition of threatening, coercing, and intimidating a qualified

    individual pursuant to the ADA, §12203(b) is defined as follows:

    "§12203, Prohibition against retaliation and coercion. (b) Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

10. Moreover, my ML&WR states the following:

    "…Buddy is also actively treating his mental disabilities of Post-Traumatic Stress Disorder (PTSD) and Depression in tandem with his current abdominal condition. Therefore, Buddy's current work duties as a parking attendant are acceptable for him, but he cannot have any additional physical or mental demands bestowed upon him during his current state of health."

11. Therefore, I allege that Tatsuguchi coerced me by changing my work schedule,

    which put me under an obligation to accommodate AOUO's need for a substitute

    security guard, which violated the terms and conditions of my ML&WR (see

    section III, ¶ no.7 herein). Tatsuguchi also coerced me by putting me under an

    obligation to illegally occupy AOUO's guard post while the licensed security

    guard patrolled exterior areas of the property, which also violated the terms and

    conditions of my ML&WR (see section III, ¶ no.8 herein). Furthermore, and after

    suggesting an elaborate scheme to heal my abdominal tumor, I took Murata's

    affiliation with, suggestions of, and direct access to a highly secretive

    pharmaceutical remedy as a threat to my life, which was delivered by Murata in an

intimidating and disturbing manner (see section III, ¶ no.11 herein). Moreover, and

during a staff meeting, Tatsuguchi made multiple ageist comments directed

towards all staff members in an intimidating and coercive manner which resulted

in Tatsuguchi's illegal adverse employment decision of having me conduct both

parking attendant and security guard duties at the AOUO guard post for six hours,

which also violated the terms and conditions of my ML&WR (see section III, ¶

no.12 herein). Collectively, these six separate violations of §12203(b) allowed the

Defendants to force a disabled individual such as myself to perform illegal acts

while giving the appearance to AOUO owners, tenants, and visitors that they were

in a safe, secure, and decent environment while simultaneously profiting

monetarily from these same violations (see section IV, ¶ no.4 herein).

- **Wrongful Termination**

12. An employer's wrongful termination of a qualified individual pursuant to the

    ADA, §12112(a) is defined as follows:

    "§12112. Discrimination (a) General rule. No covered entity shall discriminate against
    a qualified individual on the basis of disability in regard to job application procedures,
    the hiring, advancement, or discharge of employees, employee compensation, job
    training, and other terms, conditions, and privileges of employment."

13. Moreover, my ML&WR states the following:

    "…Buddy is also actively treating his mental disabilities of Post-Traumatic Stress
    Disorder (PTSD) and Depression in tandem with his current abdominal condition.
    Therefore, Buddy's current work duties as a parking attendant are acceptable for
    him, but he cannot have any additional physical or mental demands bestowed upon
    him during his current state of health."

14. Because the occurrences of my being illegally stationed at the AOUO guard post increased between 06-29-2020 thru 08-31-2020, I submitted my notice of forced resignation on 09-03-2020 for the following reasons:

   a) AOUO security guards' on-duty acts of covering a surveillance camera on numerous occasions, which jeopardized the safety and security of AOUO property and staff (see section III, ¶ no.18 & ¶ no.20 herein);

   b) AOUO security guard Smith's on-duty acts of aggressively attacking an off-property civilian, while simultaneously leaving AOUO property unsecured (see section III, ¶ no.10 herein);

   c) AOUO security guards Smith's and Barnaby's hostility towards each other due to the events of 07-09-2020, which included my involvement (see section III, ¶ no.12 & ¶ no.15 herein);

   d) Tatsuguchi's, Murata's, and Viduya's deliberate and continuous violations of the ADA, §12112(b)(5)(A), Failure to Accommodate the terms and conditions of my ML&WR on thirty-six separate occasions (see section IV, ¶ no.1 thru ¶ no.5 herein);

   e) Tatsuguchi's and Murata's three separate violations of the ADA, §12112(d)(4)(A), Unacceptable Medical Examinations and Inquiries on two separate occasions (see section IV, ¶ no.6 thru ¶ no.8 herein);

f) Tatsuguchi's and Murata's six separate violations of the ADA, §12203(b), Prohibition of Threatening, Coercion, and Intimidation on four separate occasions (see section IV, ¶ no.9 thru ¶ no.11 herein);

g) Tatsuguchi's, Murata's, and Viduya's deliberate violations of HRS, Chapter 463.1 *et seq.*: "Private Detectives and Guards" (see section IV, ¶ no.3 & ¶ no.5 herein) and;

h) Tatsuguchi's deliberate violations of the ADEA via his ageist comments on 07-09-2020 which led to Tatsuguchi's adverse employment decision of changing my work duties to illegally occupy the AOUO guard post which, in turn, created a hostile working environment (see section V below).

15. Therefore, I allege that the Defendants' deliberate breach of the terms and conditions of my ML&WR violated all of the ADA, ADEA, and HRS laws as mentioned herein, which directly caused my forced resignation in violation of the ADA, §12112(a), Wrongful Termination.

## V.   Age Discrimination and Hostile Workplace in Violation of the ADEA

1. An employer's prohibition of age discrimination of a qualified individual pursuant to the ADEA, §623(a)(1) is defined as follows:

   "§623(a) Employer practices. It shall be unlawful for an employer-
   (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."

2. Moreover, my ML&WR states the following:

"…Buddy is also actively treating his mental disabilities of Post-Traumatic Stress Disorder (PTSD) and Depression in tandem with his current abdominal condition. Therefore, Buddy's current work duties as a parking attendant are acceptable for him, but he cannot have any additional physical or mental demands bestowed upon him during his current state of health."

2. With AOUO security guard Smith's 06-22-2020 behavior of aggressively attacking an off-property civilian while simultaneously leaving AOUO property, staff, and patrons unsecured, I became concerned for my health and safety after Tatsuguchi's warnings of hostility between Smith and Barnaby (see section III, ¶ no.10 & ¶ no.15 herein).

3. Tatsuguchi's 07-14-2020 questions to me about two hostile AOUO security guards are not only inappropriate due to my position as a Parking Attendant with no supervisory authority over any coworker, but also dangerous because I could be retaliated against should my responses be biased, showing favor towards one guard and not the other (see section III, ¶ no.15 herein).

4. Therefore, I allege that Tatsuguchi violated the ADEA, §623(a)(1) when he directed his ageist comments to me and other staff members on 07-09-2020 in an intimidating and bullying manner that had nothing to do with essential parking attendant duties or AOUO business operations. Afterwards, Tatsuguchi's adverse employment decision of demanding that I illegal conduct AOUO guard post duties because of Barnaby's suspension (see section III, ¶ no.12 herein) also resulted in Smith being upset with Barnaby because Smith, who had to come in one-hour and

thirty-minutes earlier to relieve me from the AOUO guard post, had also been one of the few AOUO security guards who had initially trained Barnaby. With the hostility between Smith and Barnaby made clear by Tatsuguchi five days later on 07-14-2020, Tatsuguchi failed to discontinue his "roll over policy" (see section III, ¶ no.8 herein) nor were any safety measures put in place to protect my health and safety as required under the terms and conditions of my ML&WR prior to my resignation from the AOUO on 09-03-2020.

VI.   **Demand for Jury Trial, Relief Sought, and Official Word Count**

1.   Pursuant to Rule 38: "Right to a Jury Trial; Demand" of the Federal Rules of Civil Procedure (hereinafter referred to as "FRCP"), Plaintiff Pro Se demands a trial by jury of the above-entitled civil suit against the above-named Defendants for the alleged deliberate violations of the ADA and the ADEA as described herein.

2.   Pursuant to FRCP Rule 8(3), Plaintiff seeks financial relief in the amount of three-million, nine-hundred and forty-six thousand USD ($3,946,000.00) for general damages, compensatory damages and punitive damages due to the Defendants' alleged deliberate violations of the ADA and the ADEA as described herein.

3.   Official word count total: 6,246.

VII.   **Conclusion**

From ignoring my warning of no Guard Card, to breaching the terms and conditions of my ML&WR, and for conducting unacceptable medical exams and

asking me unacceptable medical questions, to making ageist comments which led

to a hostile workplace, the Defendants' alleged violations of the ADA, the ADEA,

and various HRS laws were done deliberately. Moreover, the intimidation and

threat to my life from Murata, including the workplace intimidation and

coerciveness from Tatsuguchi, are all valid reasons to force my resignation. Add to

the mix, an AOUO security guard attacking a civilian off-property, various AOUO

security guards covering a surveillance camera, showing up late to work, and/or

having hostility between other AOUO guards, my resignation was necessary to

protect myself from further psychological trauma and to remove myself from any

physical danger from both staff and aggressive criminals entering AOUO's main

lobby-area. Furthermore, and since filing my claim for unemployment benefits on

09-09-2020, I haven't received any unemployment benefits from the State of

Hawaii's Unemployment Insurance Claims Division (hereinafter referred to as

"UICD") nor has any UICD adjudicator contacted me to investigate my claims of

being forced to resign from the AOUO. Without these benefits, buying food and

essential items, paying monthly rent, utility bills, and medical co-payments for

therapy and medications continues to be difficult. I also suffer from daily

excruciating pain when chewing food, drinking fluids, or talking due to much

needed dental treatment (e.g., loose/infected molars). Without employment, paying

for dental work is very difficult, if not impossible. After enduring the AOUO's

unlawful events throughout the first nine months of the COVID-19 pandemic, those events continue to cause PTSD-related emotional distress via frequent bouts of insomnia, loss of appetite, severe headaches, intense anxiety, frequent mood swings, panic attacks, and/or severe depression which is being treated medically by my psychotherapist and the State of Hawaii's Department of Health. For my own health and safety, I prefer to stay indoors, fearing employer retaliation for exposing my claims to the EEOC, the Hawaii Civil Rights Commission, the Office of the Ombudsman, the Social Security Administration, the Council for Native Hawaiian Advancement, the Director of the Department of Labor and Industrial Relations, the UICD, and the Federal Court.

**VIII.   Declaration**

I, Buddy P. Kamakeeaina, Plaintiff Pro Se of the above-entitled civil case, hereby declares that the foregoing is true and correct under penalty of perjury of the laws of the United States of America.

Signed: _____          Date: <u>04-09-2021</u>

Buddy P, Kamakeeaina, Plaintiff Pro Se