IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BUDDY P. KAMAKEEAINA,<br><br>Plaintiff,<br><br>vs.<br><br>AOUO INTERSTATE BUILDING C/O PURE MANAGEMENT, ALSO DBA PURE REAL ESTATE, INC.; GREG TATSUGUCHI, PRESIDENT; GREGORY MURATA, OPERATIONS SUPERVISOR; BRANDIE VIDUYA, HUMAN RESOURCE MANAGER,<br><br>Defendants. | CIVIL NO. 21-00179 JAO-KJM<br><br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pro se Plaintiff Buddy Kamakeeaina ("Plaintiff") filed suit against his former employer and its staff, Defendants AOUO Interstate Building, Greg Tatsuguchi ("Tatsuguchi"), Gregory Murata ("Murata"), and Brandie Viduya ("Viduya") (collectively, "Defendants"), alleging violations of the Americans with Disabilities Act of 1990 ("ADA") and the Age Discrimination in Employment Act

1

of 1967 ("ADEA").  Plaintiff now moves for summary judgment on some of his claims.  *See* ECF No. 40 ("Motion").  Defendants oppose.  *See* ECF No. 50.

For the following reasons, the Court DENIES the Motion.

## I.    BACKGROUND

### A.    Evidentiary Issues

This Motion is somewhat peculiar in that it relies in large part on audio and video recordings Plaintiff made using his "personal High-Definition body camera." *See, e.g.*, ECF No. 42-15 at 1 (explaining how Plaintiff made the recording). Plaintiff also created purported transcripts of some of the recorded interactions and attached them as exhibits to his concise statement of facts.  *See, e.g.*, *id.* Defendants "note that each of Plaintiff's recordings is hearsay, and [that Plaintiff] has not put forth any explanation as to how they would be admissible."  ECF No. 50 at 9 n.2.  But it is unclear whether Defendants are objecting to the recordings, or merely alerting the Court to potential evidentiary issues they intend to raise down the line.  Regardless, the Court will consider the content of the video recordings as part of the record because the recordings are within the personal knowledge of the participants and the Court can imagine ways that at least some of the statements are admissible.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (holding that contents of a diary were admissible at summary judgment even if diary itself was not, because the contents were within the personal knowledge of

author and could be admitted into evidence in a variety of ways); Fed. R. Evid. 801(d)(2)(A) (defining hearsay to exclude an opposing party's statement).  The Court thus overrules any objection to Plaintiff's use of the video recordings at this stage.

In addition, Defendants explicitly object to Plaintiff's purported transcripts of some of the recorded events.  *See* ECF No. 50 at 9 n.2.  They claim that the transcripts "lack foundation, are also hearsay, and [lack] guarantees as to the[ir] authenticity and accuracy."  *Id.*  But such blanket objections are unpersuasive. Plaintiff provides sufficient foundation and authentication for the purported transcripts.  For example, Plaintiff's "Exhibit 011B" states it is a transcribed conversation between Tatsuguchi and another employee that took place on March 2, 2020 at about 8:30 a.m. during a morning staff meeting, which Plaintiff attended.  *See* ECF No. 42-13 at 1.  Plaintiff explains that the actual recording is available as "Exhibit 011A," which is contained on a flash drive that Plaintiff submitted to the Court.  *See id.*  Plaintiff then declares that the transcript is true and correct.  *See id.* at 2.  Plaintiff does the same for other recordings.  *See, e.g.*, ECF No. 42-21 at 1, 5.  Viewing the recordings confirms Plaintiff's assertions.  Further, that Plaintiff recorded these interactions using a wearable body camera suggests that he was present for, and thus has personal knowledge of the conversations.  As such, the Court overrules Defendants' objection to the transcripts.

**B.    Facts**

Unless otherwise noted, the following facts are undisputed.

Plaintiff began working for Defendants as a part-time parking attendant in November 2019.  *See* ECF No. 1 at 5; ECF No. 34 at 2–3; ECF No. 51-1 at 1.  Plaintiff's position as a parking attendant was to monitor the pay stations and the garage entrances for any trouble drivers faced when entering and exiting.  ECF No. 51-2 at 1.  He also had to empty the pay station (if he was the morning parking attendant), and patrol the parking garage to make sure that tenants and visitors were parked in the right areas.  *Id*.

Murata was the Operations Supervisor for the Interstate Building.  ECF No. 51-1 at 1.  His job was to oversee the operations staff, which included parking attendants, security guards, and maintenance workers.  *Id.*  Tatsuguchi was the building manager of the Interstate Building.  *See* ECF No. 51-2 at 1.  Plaintiff refers to Viduya as the Human Resources Manager, *see* ECF No. 1 (caption), but Defendants deny this, *see* ECF No. 34 at 2, and there is no evidence offered as to her official role or title.

During Plaintiff's first month on the job, Murata asked whether he had a "Guard Card" — a license required to be a security guard in Hawaiʻi.[1]  *See* ECF No. 42 ¶ 1; ECF No. 51 ¶ 1; ECF No. 42-3 at 1.  Apparently, Murata needed coverage for the night guard and thought Plaintiff may want the extra hours.  *See* ECF No. 42-3 at 1.  Plaintiff informed Murata that he did not have the license because of his disability.  *See* ECF No. 42 ¶ 1; ECF No. 51 ¶ 1; ECF No. 42-3 at 1.  At that time, Plaintiff did not explain what he meant by his "disability."  *See* ECF No. 42-3 at 1.

But in December 2019, Plaintiff's physician wrote a letter detailing Plaintiff's physical and mental conditions and how they affected Plaintiff's ability to work.  *See* ECF No. 42-5 at 1.  Specifically, Plaintiff's doctor noted that Plaintiff suffered from "a medical condition involving an approximate 3[-inch] solid mass tumor of the left lateral abdominal wall located within the musculature," which limited Plaintiff to "Work schedule:  no more than 30 hours per week; Lifting:  no more than 10 lbs; Reaching; Pulling; Pushing; Climbing; Crawling; Bending and Squatting."  *Id.*  She also commented that Plaintiff was "actively treating his

---

[1]  Under Hawaiʻi law, "[n]o individual shall engage in the business of guard . . . without first obtaining a license as guard from the board and paying the application and license fees."  Hawaiʻi Revised Statutes § 463-7(a).

mental disabilities of Post-Traumatic Stress Disorder (PTSD) and Depression in tandem with his current abdominal condition.  Therefore, [Plaintiff]'s current work duties as a parking attendant are acceptable for him, but he cannot have any additional physical or mental demands bestowed upon him during his current state of health." *Id.*[2]

Plaintiff claims he submitted the ML&WR to Defendants in December 2019, *see* ECF No. 42 ¶ 2, but Defendants do not so concede, *see* ECF No. 51 ¶ 2.  At some point, however, Viduya had a copy of the letter, *see* ECF No. 42 ¶ 12; ECF No. 51 ¶ 12, and Murata and Tatsuguchi admit to being aware of Plaintiff's physical condition and need for accommodations, *see* ECF No. 51 ¶ 2.

In January 2020, a man entered the Interstate Building and allegedly assaulted two women.  *See* ECF No. 42 ¶ 3; ECF No. 51 ¶ 3; ECF No. 42-11.  This prompted Defendants to hire a daytime security guard.  *See* ECF No. 51-1 at 2; ECF No. 51-2 at 2.  The security guard's duty was to be a presence in the lobby to deter trespassing:  the security guard would sit at the security station — which Plaintiff refers to as the guard post — and monitor the security cameras.  *See* ECF No. 51-2 at 2.

---

[2]  Plaintiff refers to the doctor's letter as the "ML&WR," which stands for Medical Limitations and Work Restrictions letter.  *See* ECF No. 1 at 6.

Plaintiff alleges that Tatsuguchi thereafter initiated a "roll over" policy, which required Plaintiff to occupy the guard post while the security guard patrolled exterior areas of the property. *See* ECF No. 42 ¶ 6. Tatsuguchi admits to asking all staff to help cover for the guard while the guard was out or taking incidental breaks. *See* ECF No. 51 ¶ 6; ECF No. 51-2 at 2. Plaintiff asserts that he sat at the guard post on thirty-six different dates between March and August 2020 due to the roll over policy. *See* ECF No. 42 ¶¶ 7, 10, 16. Both Tatsuguchi and Murata state that Plaintiff never expressed any concern to them about sitting at the guard post. *See* ECF No. 51-1 at 4; ECF No. 51-2 at 2. Both further claim that they never forced Plaintiff to perform guard duties. *See* ECF No. 51-1 at 4; ECF No. 51-2 at 2.

Plaintiff also takes issue with an interaction he had with Murata in July 2020. During a conversation about Plaintiff's tumor, Murata remarked that his cousin's husband was a "big boss[]" at a pharmaceutical corporation and that he told Murata about a secret treatment that "kills the stuff within . . . twenty-four hours." ECF No. 42-15 at 2. Murata told Plaintiff that his cousin's husband told him not to tell anybody, and that if the information got out, the drug company "might want to kill you." *Id.* Murata admits to having the conversation with Plaintiff but disputes the context and intent. *See* ECF No. 51-1 at 3. He claims that he was concerned about Plaintiff's well-being, that he and Plaintiff often

talked about his medical conditions, and that he did not mean to imply that the pharmaceutical company would target Plaintiff.  *See id.*

Two days prior to resigning, Plaintiff informed Tatsuguchi that security guards were covering a surveillance camera, and that this put Plaintiff in danger. *See* ECF No. 42-20 at 1–2.  Tatsuguchi declares that he told Plaintiff he would look into the matter and that the investigation would take a couple of weeks so as not to implicate Plaintiff for informing on the guards.  *See* ECF No. 51-2 at 3–4. Plaintiff resigned on September 3, 2020.  *See* ECF No. 42 ¶ 20; ECF No. 51 ¶ 20. He claims that his resignation was forced and thus constituted a constructive discharge.  *See* ECF No. 42 ¶ 20; ECF No. 42-2.  In Plaintiff's resignation letter, he referred to his reporting about the covered camera as "whistleblowing," and cited it as one of the reasons he felt compelled to resign.  *See* ECF No. 42-2.

### C.   Procedural History

Plaintiff initiated this lawsuit on April 12, 2021.  *See* ECF No. 1.  In his Complaint, Plaintiff alleges five different causes of action:  (1) Failure to Accommodate under the ADA — 36 counts; (2) Unacceptable Medical Exams and Inquiries under the ADA — three counts; (3) Prohibition of Threatening, Coercion, & Intimidation under the ADA — six counts; (4) Wrongful Termination under the ADA — one count; and (5) Prohibition of Age Discrimination and Hostile Work

Environment under the ADA — two counts.  *See id.* at 1 (caption).[3]  Defendants

answered the Complaint on September 20, 2021.  *See* ECF No. 34.

Plaintiff filed the instant Motion on January 4, 2022.  *See* ECF No. 40.  He

moves for summary judgment on the failure to accommodate and wrongful

termination claims pursuant to the ADA, and the age discrimination and hostile

work environment claims under the ADEA.  *See id.* at 3–7.  Defendants opposed,

*see* ECF No. 50, and Plaintiff filed a reply, *see* ECF No. 58.

## II.   LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R.

Civ. P. 56(a).  "A party seeking summary judgment bears the initial burden of

informing the court of the basis for its motion and of identifying those portions of

the pleadings and discovery responses that demonstrate the absence of a genuine

issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see T.W.*

*Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.

1987).  In a motion for summary judgment, the court must view the facts in the

---

[3]  The body of the Complaint is somewhat vague regarding the number of counts
alleged for each claim.

light most favorable to the nonmoving party.  *See State Farm Fire & Cas. Co. v. Martin*, 872 F.2d 319, 320 (9th Cir. 1989) (per curiam).

Once the moving party has met its burden of demonstrating the absence of any genuine issue of material fact, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See T.W. Elec.*, 809 F.2d at 630; Fed. R. Civ. P. 56(c).  The opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support its legal theory.  *See Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The nonmoving party cannot stand on its pleadings, nor can it simply assert that it will be able to discredit the movant's evidence at trial.  *See T.W. Elec.*, 809 F.2d at 630; *Blue Ocean Pres. Soc'y v. Watkins*, 754 F. Supp. 1450, 1455 (D. Haw. 1991).

If the nonmoving party fails to assert specific facts, beyond the mere allegations or denials in its response, summary judgment, if appropriate, shall be entered.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990); Fed. R. Civ. P. 56(e).  There is no genuine issue of fact if the opposing party fails to offer evidence sufficient to establish the existence of an element essential to that party's case.  *See Celotex*, 477 U.S. at 322; *Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994); *Blue Ocean*, 754 F. Supp. at 1455.

In considering a motion for summary judgment, "the court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec.*, 809 F.2d at 631 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986)) (footnote omitted).  Inferences must be drawn in favor of the nonmoving party.  *See id.*  However, when the opposing party offers no direct evidence of a material fact, inferences may be drawn only if they are reasonable in light of the other undisputed background or contextual facts and if they are permissible under the governing substantive law.  *See id.* at 631–32.  If the factual context makes the opposing party's claim implausible, that party must come forward with more persuasive evidence than otherwise necessary to show there is a genuine issue for trial.  *See Bator v. Hawaii*, 39 F.3d 1021, 1026 (9th Cir. 1994) (citing *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).

## III.    DISCUSSION

### A.    ADA — Failure To Accommodate

"The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a 'qualified individual,' the employer receives adequate notice, and a reasonable accommodation is available that would

not place an undue hardship on the operation of the employer's business." *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (citing 42 U.S.C. § 12112(b)(5)(A)). "Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001) (citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000)).

Plaintiff asserts that Defendant failed to accommodate his disabilities each of the thirty-six times he occupied the guard post. *See* ECF No. 41 at 22. Plaintiff's reasoning is that he could not obtain a Guard Card because of his disability, and that therefore it was illegal for him to sit at the guard post and serve as a security guard. *See id.* Defendants, among other things, argue that Plaintiff failed to give them adequate notice that he could not temporarily sit at the guard post and that he needed an accommodation. *See* ECF No. 50 at 14–16.

The Court concludes that there is a factual question as to whether Plaintiff requested an accommodation and thus whether Defendants had sufficient notice of

Plaintiff's need for an accommodation.[4]  While Plaintiff told Murata that he could not get a Guard Card because of his disability, *see* ECF No. 42-3 at 1, that alone is insufficient to establish as a matter of law that Defendants were on notice that Plaintiff needed accommodation.  Reading the evidence in the light most favorable to Defendants, Plaintiff's inability to get a Guard Card may have put Defendants on notice that he could not serve as a full-time security guard, but says nothing about needing an accommodation from temporarily sitting at the lobby guard post.  Some of Defendants' evidence supports that inference.  For example, Murata remembers asking Plaintiff if he had a Guard Card because Murata wanted to give Plaintiff the opportunity for additional work *as a security guard* — a different position than the parking attendant position.[5]  *See* ECF No. 51-1 at 2.  Further, and crucially, both Murata and Tatsuguchi declared that Plaintiff never complained about or objected to occupying the guard post.  *See id.* at 4; ECF No. 51-2 at 2.  In

---

[4]  The Court's focus on the notice aspect of Plaintiff's claim does not imply anything about the other elements that Plaintiff must prove to prevail on this cause of action.  The Court takes no position on any other element of an ADA failure to accommodate claim.

[5]  Even if Defendants' actions violated the state's security guard licensing requirements — an issue on which the Court does not opine — there is no reason to conclude that such a violation would necessarily also constitute a breach of the ADA.

other words, there is evidence that Plaintiff never requested an accommodation from attending to the guard post.

Similarly, at this stage of the proceedings, Plaintiff's submission of the ML&WR does not necessarily constitute a request for a reasonable accommodation. Considering the evidence in the light most favorable to Defendants, it is unclear when Plaintiff submitted the ML&WR to Defendants and to what extent that would put Defendants on notice of the need to accommodate Plaintiff's purported inability to sit at the guard post. *See* ECF No. 42-5 at 1 (letter dated December 13, 2019, but no indication of when Defendants received it or who read it). But even assuming Defendants received the ML&WR on December 16, 2019, Plaintiff states that the first time he sat at the guard post was on March 10, 2020. *See* ECF No. 42 ¶ 7. Thus, sitting at the guard post was not contemplated as a role of the parking attendant when Plaintiff submitted the letter purportedly limiting him to the duties of that position. In other words, the letter pre-dated the additional job assignment and could not necessarily serve as a request for an accommodation from that specific unanticipated task.

That there was a nearly three-month gap between the earliest date on which Defendants would have received the ML&WR and when Plaintiff first sat at the guard post further bolsters the Court's conclusion. The Court cannot say as a matter of law that Defendants had an obligation to remember Plaintiff's general

14

limitations from December 2019, apply those limitations to the new responsibilities of the role in March 2020, and treat that earlier letter as a request for an accommodation in the absence of a specific contemporaneous request from Plaintiff.  This is especially true when one considers that from March until September 2020, when he left his job, Plaintiff apparently never told Defendants that he was unable to occupy the guard post and never asked for an accommodation.  *See* ECF No. 51-1 at 4; ECF No. 51-2 at 2.  Simply put, there is a factual question as to whether Plaintiff made Defendants aware of his need for an accommodation.  *See Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1188–89 (9th Cir. 2001) (holding that employer had no duty to accommodate where employee did not request an accommodation and where record did not show that employee was unable to make a request); *Wells v. Mutual of Enumclaw*, 244 F. App'x 790, 791 (9th Cir. 2007) (affirming summary judgment for employer where employee neither requested accommodation nor gave reason for employer to know that his disability prevented him from making such request).[6]  While Plaintiff may have

---

[6]  Notably, because of Plaintiff's litigation history, he should have been aware of his obligation to request reasonable accommodations.  Plaintiff previously brought ADA and ADEA claims against a company that allegedly refused to hire him.  *See Kamakeeaina v. Armstrong Produce, Inc.*, Case No. 18-cv-00480-DKW-RT, 2019 WL 1320032, at *1 (D. Haw. Mar. 22, 2019).  Judge Watson, in dismissing Plaintiff's failure to accommodate claim, explained that "ordinarily, an employee or applicant must make an initial request for an accommodation."  *Id.* at *6

(continued . . .)

15

thought that submitting the ML&WR was an initial request for an accommodation, his failure to reiterate that request when he first began sitting at the guard post defeats his Motion at this stage of the proceedings.

And while there are some circumstances in which an employer must initiate the interactive process in the absence of a request from the employee, viewing the facts in the light most favorable to Defendants, the current record does not reflect those circumstances.  In *Barnett*, the Ninth Circuit noted that "[t]he interactive process is triggered either by a request for accommodation by a disabled employee *or by the employer's recognition of the need for such an accommodation*." *Barnett*, 228 F.3d at 1112 (emphasis added).  *Brown* explained that this exception to the employee request rule applies "when the employer '(1) knows that the employee has a disability, (2) knows, or has reason to know, that the employee is experiencing workplace problems because of the disability, and (3) knows, or has reason to know, that the disability prevents the employee from requesting a reasonable accommodation.'"  *Brown*, 246 F.3d at 1188 (quoting *Barnett*, 228 F.3d at 1112).  On the current record, while the ML&WR may have put Defendants on notice about Plaintiff's physical and mental conditions, there is evidence that

---

(. . . continued)

(citation omitted).  Judge Watson granted Plaintiff leave to amend but warned that that "in any amended complaint he may file, among other things, he *must* allege what reasonable accommodation he either did request or would have requested." *Id.*

16

disputes whether Plaintiff experienced workplace problems because of them.  *See* ECF No. 51-1 at 4 (Murata declaring that Plaintiff never complained about sitting or standing at guard stand).  The record also lacks evidence establishing that Plaintiff was unable to request accommodations for any reason.  Thus, there is a factual question as to whether the circumstances triggered any obligation for Defendants to initiate the interactive process.

The Court therefore denies Plaintiff's Motion as to the failure to accommodate cause of action.

## B.    ADA — Wrongful Termination

Plaintiff asserts a wrongful termination claim under the ADA, *see* ECF No. 1 at 21; ECF No. 41 at 24, but acknowledges that Defendants did not fire him, ECF No. 58 at 16.  Rather, he argues that Defendants' actions forced him to resign and that, thus, Defendants constructively terminated him.  ECF No. 58 at 16; *see also* ECF No. 42-21 (transcript of meeting in which Plaintiff announces his resignation).  The Court concludes that there is a triable issue as to whether Defendants constructively discharged Plaintiff.[7]

---

[7]  As with the failure to accommodate claim, the Court's lack of discussion on any other element of Plaintiff's ADA unlawful termination claim does not imply anything about the Court's view of the other elements.

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, 578 U.S. 547, 555 (2016) (quoting *Pa. State Police* v. *Suders*, 542 U.S. 129, 141 (2004)); *Atwood v. Consol. Elec. Distribs., Inc.*, 231 F. App'x 767, 769 (9th Cir. 2007) (considering constructive discharge claim in an ADA and ADEA case). "Such intolerable conditions may be shown through a continuous pattern of harsh treatment." *E.E.O.C. v. Placer ARC*, 114 F. Supp. 3d 1048, 1062 (E.D. Cal. 2015) (citing *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1412 (9th Cir. 1996) (other citation omitted). The intolerable conditions must be because of discrimination. *See Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) ("[C]onstructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." (internal quotation marks and citations omitted)). Further, the standard to prove constructive discharge is higher than the standard to establish a hostile work environment. *See id.* And "[t]he determination whether conditions were so intolerable and discriminatory as to justify a reasonable employee's

18

decision to resign is normally a factual question left to the trier of fact." *Watson v. Nationwide Ins. Co.* 823 F.2d 360, 361 (9th Cir. 1987) (citation omitted).

Plaintiff's motion for summary judgment on this claim fails for at least two alternative reasons. First, as discussed above, because Plaintiff failed to establish that he gave Defendants sufficient notice of his need for an accommodation, he has not proven disability discrimination as a matter of law. Without any proof of discrimination, the Court cannot conclude on the current record that any intolerable environment occurred "as a result of discrimination." *See Brooks*, 229 F.3d at 930.

Second, there is a factual question as to whether the working conditions Plaintiff faced were so intolerable that they would compel a reasonable person to resign. Reading the record in the light most favorable to Defendants, Plaintiff was asked to sit at the guard post temporarily and was never forced to sit there. *See* ECF No. 51-1 at 3–4; ECF No. 51-2 at 2. Plaintiff never expressed concern about sitting at the guard station. *See* ECF No. 51-2 at 2. And while Plaintiff submitted the ML&WR — which purportedly limited Plaintiff only to performing the duties of a parking attendant — the letter pre-dated any employee being asked to sit at the guard post, and Plaintiff never complained about it. *See* ECF No. 51-1 at 4. From these facts, a jury reasonably could conclude that Defendants' asking Plaintiff to sit at the guard post despite the ML&WR did not create intolerable working conditions. *See Poland v. Chertoff*, 494 F.3d 1174, 1185 (9th Cir. 2007) ("Because

we require job conditions to be worse than those which a reasonable person could tolerate, '[a]n employee may not . . . be unreasonably sensitive to a change in job responsibilities.'" (quoting *Serrano–Cruz v. DFI P.R., Inc.*, 109 F.3d 23, 26 (1st Cir. 1997))) (alterations in original).

Further, to the extent Plaintiff takes issue with Defendants' discussions with him about his medical conditions, there is some dispute about whether he initiated such conversation or volunteered such information. *See* ECF No. 51-1 at 3. Similarly, how to interpret Murata's comments to Plaintiff that pharmaceutical companies "might want to kill you" if information about alternative remedies were disclosed, is a question for the factfinder. *See* ECF No. 42-15 at 2. Reading the record in the light most favorable to Defendants, Plaintiff has not established as a matter of law that any reasonable person would feel compelled to resign due to such interactions.

Plaintiff also seems to argue that his resignation was compelled by Defendants' inaction in response to his reporting that security guards were obstructing a security camera. *See* ECF No. 41 at 19–20; ECF No. 58 at 16–17. The Court notes that there is no obvious connection between Plaintiff's reporting of the security guards and Plaintiff's alleged disability discrimination, and Plaintiff fails to explain the relation. Regardless, even if there is some connection to Plaintiff's purported discrimination, the Court concludes that again there is a

factual dispute about how to interpret the reasonableness of Defendants' actions after Plaintiff's disclosure. Plaintiff reported on September 1, 2020 that guards were covering the security camera. *See* ECF No. 42 ¶ 17; ECF No. 51 ¶ 17. Tatsuguchi told Plaintiff that it would take a couple of weeks to investigate the allegations. *See* ECF No. 51-2 at 3–4; ECF No. 60 ¶ 17. Tatsuguchi asserts the weeks-long investigation was at least in part to avoid implicating Plaintiff for reporting the guards. ECF No. 51-2 at 3–4. Nonetheless, Plaintiff resigned during the morning meeting two days later, on September 3, 2020. ECF No. 42 ¶ 20; ECF No. 51 ¶ 20. Clearly, Plaintiff found the working conditions untenable, but whether a reasonable person in his position would agree is a matter for the factfinder. A jury reasonably could conclude that Defendants' purported inaction after just two days did not create a situation in which any reasonable person would feel compelled to resign.

Thus, the Court denies Plaintiff's Motion as to his ADA wrongful termination claim.

## C.   ADEA — Age Discrimination Hostile Work Environment

The contours of Plaintiff's ADEA claim are unclear. He argues:

> Tatsuguchi made multiple ageist comments towards Plaintiff and other employees during a routine AOUO morning meeting (see Pgs. no.9 - no.10, § (B), ¶ no.10 herein) which, in turn, led to the Defendants' adverse employment action to enforce Tatsuguchi's illegal roll over policy (see Pg. no.7, § (B), ¶ no.7 herein) after

21

Tatsuguchi suspended the AOUO licensed security guard ("Guard no.1").

Immediately following said suspension, the Defendants' adverse employment action resulted in Plaintiffs illegal occupation of the AOUO Guard Post for a continuous 6-hours until relieved by another AOUO licensed security guard ("Guard no.2") which, in turn, created a hostile work environment between Guard no.1 and Guard no.2 as stated by Tatsuguchi 5-days later during an in-person meeting with Plaintiff (see Pg. no.13, § (B), ¶ no.13 herein).  Moreover, and despite the hostile environment, the Defendants[] failed to discontinue Tatsuguchi's illegal roll over policy in order to protect Plaintiff's health and safety as listed under the terms and conditions of his ML&WR and under the privileges of employment of AOAO's Policy no.1 - AOAO Policy no.8 (see Pgs. no.2 - no.3, § (A), ¶ no. l - ¶ no.8 herein).

ECF No. 41 at 23–24.

The ADEA provides that "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age."  29 U.S.C. § 623(a).  Under the ADEA, a plaintiff may rely on disparate treatment or disparate impact theories of discrimination.  *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609–10 (1993); *Sischo–Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1109 & n.6 (9th Cir. 1991), *superseded by statute on other grounds as recognized by Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1041 (9th Cir. 2005).  A plaintiff may also establish a violation of the ADEA by proving the existence of a hostile work environment.  *See Aoyagi v. Straub Clinic & Hosp., Inc.*, 140 F. Supp. 3d 1043,

1058 (D. Haw. 2015) (citing *Sischo–Nownejad*, 934 F.2d at 1109 (other citations omitted)).  Among other things, "[a] hostile work environment requires the existence of severe or pervasive and unwelcome verbal or physical harassment because of a plaintiff's membership in a protected class." *Sischo–Nownejad*, 934 F.2d at 1109 (applying same inquiry to hostile work environment claims raised under Title VII and the ADEA) (citations omitted).  To assess whether an environment is sufficiently hostile, courts examine the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (internal quotation marks and citation omitted).  The conduct must be both objectively and subjectively offensive.  *See id.* at 787; *Aoyagi*, 140 F. Supp. 3d at 1059.

In support of his ADEA claim, Plaintiff directs the Court to a comment Tatsuguchi made during a morning staff meeting.  On July 9, 2020, Tatsuguchi told the members of staff that were present at the meeting, "I shouldn't have to be telling you guys twice, or three times, or four times, right[?]  You guys all old enough, right[?]"  ECF No. 42 ¶ 9; ECF No. 42-16 at 2.  Plaintiff then alleges that Tatsuguchi made Plaintiff sit at the guard post, which Plaintiff claims is an adverse

employment action.  Plaintiff does not alert the Court to any other age-related comments or actions.

Whether Tatsuguchi's single statement is even "ageist," as Plaintiff argues, is a matter of interpretation for the factfinder.  If anything, the comment implies that the staff are mature enough to understand directions, rather than that they are too old to perform their jobs.  Such a comment may not even target the class of persons that the ADEA sets out to protect.  *See* 29 U.S.C. § 621(b) ("It is therefore the purpose of this chapter to promote employment of *older persons* based on their ability rather than age[.]" (emphasis added)).  Further, Tatsuguchi did not direct the comment at Plaintiff; he made it to multiple staff members — presumably of different ages — that attended the meeting.  *See* ECF No. 42-16 at 1–2.  Thus, to the extent Plaintiff claims Defendant subjected him to disparate treatment or that he suffered a disparate impact because of his age, Plaintiff has not established that age motivated Defendants' actions.  *See Hazen Paper Co.*, 507 U.S. at 610 ("In a disparate treatment case, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." (citations omitted)).

Similarly, to the extent Plaintiff argues that the statement created a hostile work environment, the Court concludes that there is a dispute as to whether the comment was objectively offensive and discriminatory in relation to Plaintiff's age.  Even if the Court assumed that the statement was offensive, other judges in

24

this district have held that evidence of a single age-related comment does not preclude summary judgment *for the employer* on an employee's hostile work environment ADEA claim.  *See Aoyagi*, 140 F. Supp. 3d at 1059; *Lalau v. City & County of Honolulu*, 938 F. Supp. 2d 1000, 1016–17 (D. Haw. 2013).  In *Aoyagi*, the allegedly discriminatory comment was that younger secretaries were more tech savvy than the plaintiff, but Judge Kay noted that "[e]ven assuming this incident does reflect age discrimination, this single statement hardly qualifies as 'sufficiently severe or pervasive' to support a hostile work environment claim on the basis of age discrimination."  *Aoyagi*, 140 F. Supp. 3d at 1054; *see also id.* at 1059.  In *Lalau*, the allegedly discriminatory comment was that a supervisory position would be going to "'a younger guy as [plaintiff] was too old anyway.'" *Lalau*, 938 F. Supp. 2d at 1012 (citation omitted).  But Judge Mollway held that such evidence was "too sparse to support a claim that the workplace was 'permeated' with hostility sufficiently 'severe' or 'pervasive' to alter the conditions of his employment," and granted summary judgment to the employer on the hostile work environment claim.  *Id.* at 1016–17.  It follows from *Aoyagi* and *Lalau* that if evidence of a single age-related comment is insufficient to defeat a defendant-employer's motion for summary judgment, then Plaintiff's evidence of one arguably age-related comment is too sparse to support Plaintiff's assertion of a

hostile work environment.  As such, the Court denies Plaintiff's Motion as to his

ADEA claim.

### IV.  CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's Motion.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, March 24, 2022.



Jill A. Otake
United States District Judge

---

Civil No. 21-00179 JAO-KJM; *Buddy P. Kamakeeaina v. AOUO Interstate Building, et al.*; ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT